Our fifth case for this morning is United States v. Benson. Mr. Sasson. May it please the court. This appeal is about a single mother up to a sentence of three years in prison for embezzling from her employer. Ms. Benson's sentence was imposed largely as a result of the court's loss calculation, which drove up the guideline range, as well as its finding not giving her the acceptance of responsibility that was in the plea agreement. It's our position that these two errors combined resulted in an appropriate sentence that should be vacated and sent back or reduced. First of all, it's our position that there was an incorrect selection in the method of calculating the loss calculation in this case, particularly in light of the facts that were presented in the sentencing hearing. But you treat this as though it's an extrapolation case, and it really isn't. They've got the data of number of memberships sold from this patron's edge thing. They also have the data of how many get inputted into the other system, which I'm forgetting the name of, but anyway, into the membership system. Razor's edge, yes. A little cute pun. And there's a discrepancy, so that comes out to a certain amount of money. And we know that she has been selling for cash memberships, and so there's a piece-of-paper-by-piece-of-paper comparison with four sample months, four months just picked out of a hat, although they were heavy usage months, with the idea that maybe that would reveal more things. So for those, it turns out she's really the one responsible for that. So if there's any extrapolation at all, it's just is there some reason to think somebody else was responsible for the numbers in other months? And you didn't present any evidence to suggest that someone else had the access to the cash registers. Of course, she's also skimming from the drink sales and events, but the lion's share of this is the sales. It's just not – I don't think it fits the model of a statistical operation where you're doing some random sampling. It's not what they did. Well, our position is the four months is a method of checking the first stage. So the first stage is the paper-by-paper. Right. It's the first one giving us a number that's a reliable number. And when they do the spot check of these four months, the answer is yes. It's coming out within dollars of the other. And the problem as we see it is how that four months was selected. Why? Why is it a problem? Why couldn't it have been the first four months, the last four months? Why does it matter? Because there was a subjective method used, which violates the AICPA standards. No, I mean, you say that, but if you are trying to take a random sample, but they're actually – it's as though I was trying to figure out, you know, how many cases in the Northern District of Illinois are dismissed on Rule 12b-6 grounds, and all I can find from AO statistics is Rule 12b itself. So I go into the actual docket of the Northern District of Illinois, and I figure out how many are 12b-1s, 12b-2s, and on up. And, you know, that gives me data. That's not sampling. It tells me how many cases over a month. Well, what we have here with the four months and what was not considered as my basis for the improper selection is the four months were all clustered within the last two and a half to three years. But what's your evidence that somebody else was in a position to skim this money during other times covered by this indictment? The investigation conducted by the accountant firm that was retained by the museum, in the interview with one of the supervisors, Ms. Clayton, referred to one or two other employees that she was aware of that were skimming one way or the other, but similar to this case when it came to memberships. But it wasn't that strong. Wasn't there just speculation that others, that somebody else may have been? No, no. She didn't have evidence of it. I'm sorry. I didn't mean to interrupt the judge. The one person that was referred to was actually either terminated or left, voluntarily left her employment when confronted with the information. I'm not sure if the second one had the same result with her employment. But it was more than just speculation as to there might be other people doing it. There were names given. There were identifiable instances, as I said, where at least one was either terminated or left. They were able, though, to see how many memberships she sold from the patron's edge. And they were also able to see how many memberships were reported. And that's why the data actually takes it down to her. Well, and I'd like to address that by expanding just a little bit on the reasons why we think that it was the wrong method selected. Other people doing it is not the only reason. But when you look at the objective facts or evidence that was presented both through the FBI investigation as well as Mr. Lugaitis's report and testimony, the sample months to confirm, the four months, well, 68 percent of the loss calculation was not confirmed by any checking. And that 68 percent is roughly the difference in the two calculations as to the loss amount. The reason why I say it's important because in Mr. Lugaitis's approach, as to the period of time where the four months were used, there was about a 91 percent correlation with his approach, which is fairly consistent with what the account at Stone Turn found. I think theirs was about 97 or 98 percent, so high correlation. But we have the 68 percent loss where there was only about a 21 percent correlation. And his approach in terms of tracking loss and finding where money went and assets acquired. But that's meaningless with cash. I mean, she could have gone gambling. She could have put it under her mattress. She could have burned it up. I mean, she could have done anything with cash. The fact that you can't get cash into a bank account, you can't trace it, strikes me as failing to realize the advantage of cash. Well, cash does have its advantages in difficult to specifically track cash. But there is other factors that were not considered that the FBI found that would tend to discount the amount it was taking. It seems to me that she is so well positioned to come forward with something beyond speculation, though. She worked there a long time. She was the accountant, if I'm not mistaken, that was responsible for reconciling the two systems. She worked on the cash end of this, both at the concessions area and then, more importantly, with the membership revenue. And so if there was something else going on, somebody else was skimming or there was money heading out the back door another way, I mean, she is awfully well positioned to proffer that reason, and she has every incentive to. Does she not in this context? She does, and I just, touching on her position there, she did several things. And so it wasn't necessarily where she came in and had the advantage of having a position where she could oversee. Some days she was doing one thing and others it was. But again, the records that they traced, as Judge Wood pointed out, were particular to her. They were her records for her entries. Right, and getting back to the 68% that wasn't confirmed, you have such a wide discretion where, in the lack of any other identifiable assets that she owned, no property, no real estate, no investments, nothing that even with cash and no evidence of any gambling, no evidence of any drug problems, there was no evidence presented of anything that would say she's taking this cash, it's not going into her account and using it on something else. Yet you have this large discrepancy in the methods. I think... You might want to save a little bit of time. I would like to, and the last point is the calculation. And I think that, as I argued, Ms. Benson appropriately addressed it. This was an issue that existed at the time of the plea, and she should have received acceptance responsibility under the cases and procedure that she followed and relying on the appointed expert that she had. Thank you, Judge. All right, thank you. Ms. Alexakis? May it please the Court. My name is Georgia Alexakis, and I represent the United States. This Court should affirm the defendant's sentence. The District Court did not err in determining that defendants stole $906,484 from Chicago's Field Museum. The District Court made this finding by preponderance of the evidence, and it was based on extensive testimony and reports, both from the government's accounting expert, Rex Humme, as well as the defendant's accounting expert. So it's a little troubling, though, that the government just did these four months, and then over this long period of time didn't, when that worked out, didn't go back and try to maybe do, like, one a year or something, just further checking because it leaves a lot of loose ends. Other employees could have come and gone. I mean, it's the government's burden. Your Honor, from the government's perspective, additional testing may have been necessary if that second step of Mr. Humme's methodology hadn't matched the first step of the methodology so closely. And so, for example, when we have one sample month that's coming up with a discrepancy of, I think it was only $36 between step one and step two, I think... Some of them were too high, though, right? I believe, Your Honor, that the greatest discrepancy, there was a discrepancy of, if I'm doing my math correctly right now, it's a little over $400. That was for July 2013. But in April 2012, we're looking at a discrepancy of $36. In December of 2013, we're looking at a discrepancy of less than $100. And in March 2014, we're looking at a discrepancy of slightly more than $100. Which is ironclad evidence for those months, but it postulates that the Field Museum never suffered from a different dishonest employee during any of the rest of that time. This is all, I understand, probably because the records were available, maybe as a reason. This is all at the back end of her dishonest activities. This is the last two years of what was a six- to seven-year scheme. Right, but this goes all the way back to what, to 07-08? Ms. Benson admitted to stealing prior to 2008. The museum and the government restricted its loss analysis to 2008 forward, because 2008 forward was when we had both systems, the patron's edge and the raider's edge. So essentially we gave her the benefit of the doubt of any theft that may have taken place before 2008. But you don't have anything that nails down that there was no confounding factor from 2008 to around 2012. That's a long time, four years. There's nothing in terms of a second step of the methodology, Judge, but in terms of specifically how the district court handled that particular concern at sentencing, I think one, again, you have the closeness, the matching between the first and the second step of the methodology. And also the fact that there was no evidence presented by the defendant, and no suggestion really in the record, that there was any reason to believe that the results would have been different from 2008 through 2012. Does her signature appear on these membership receipts? Her initials appear on those. So something identified. I thought that was right. I just wanted to let it down. And so there's nothing to suggest, for example, the defendant argued at sentencing that there may have been data entry errors that were made in patron's edge pre-2012. Or perhaps there were errors in implementing the raider's edge system pre-2012, and that may have had some effect on the analysis. But those were speculative arguments that were made by the defendant at sentencing, and the district court recognized them as such, essentially saying you have no reason to believe that the government's accounting expert selected only months from the last two years for some, I believe his words were for some nefarious reason, or for some reason to think that earlier months would have suggested otherwise. Can I ask you one thing? I thought what you might say on that was that it's a mistake to view the evidence around the loss amount simply in terms of the sampling evidence and what the sampling evidence showed. Rather, what's important here as well is that the Field Museum, they hired Drinker Biddle to conduct an investigation. That investigation consisted, as I understand it, of interviews of a lot of different people where they had every incentive to try to figure out, was there someone other than Ms. Benson involved in this fraud scheme? And they reached the conclusion, no. And that, I understand, is what Stone Turn relied upon. In other words, that evidence combined with the sampling to reach the conclusion that the full loss amount is attributable to the defendant. I would agree with that, Judge, because those interviews took place, the kind of investigation that you're describing took place in the lead-up to the development of this two-step methodology that Mr. Hummey adopted. And so the information that he got out of those interviews, which was that there wasn't some other culprit in mind, that the theft from these membership sales were being taken from on-site cash sales, and that included Ms. Benson's own admission to museum employees that this is how she had been conducting the theft. That went into designing this two-step methodology, where the second step of the methodology was specifically designed to test the proposition that had emerged from this earlier phase of the investigation, that the theft was largely attributable, solely attributable to the defendant through the theft of on-site cash sales from the membership revenue. And so the district court considered this methodology, considered the scope of the government's investigation and Drinker Biddle's investigation at the sentencing hearing, found that the loss calculation methodology was sound and reasonable, those were the district court's words, and addressed each and every one of the critiques, the extensive critiques, that the defendant made of that loss calculation methodology. And for that reason, this court should affirm the district court's finding. Similarly, this court should affirm the district court's finding that the defendant, in launching the kind of attack that the defendant launched on the government's loss calculation methodology, at that point did not deserve acceptance of responsibility credit. In the course of... So this is this fine line between the ability to contest a methodology and still get acceptance of responsibility for being cooperative, for being remorseful, but basically saying, look, government, you just haven't met your burden of proof because you've chosen the wrong methodology. You used astrological charts instead of accounting principles or whatever it may be. I know it's not that here, but people are not automatically excluded from acceptance of responsibility if they challenge a methodology. Correct, Judge, and it is a fine line. And here the government's position, and the district court agreed, was that the defendant crossed it, in part because of the extent of the contesting of the loss amount. This wasn't just quibbling over a few hundred or a few thousand dollars. It was a full-throated attack on more than half of the government's loss amount, and it also included what the district... But suppose that's what the methodology produced, right? Correct, Judge. Under her methodology, it was about half of what you thought it was. But part of the issue, too, Judge, was that the defendant's attacks included what the district court considered to be frivolous attacks on the government's loss calculation methodology. So in particular, there was a criticism of a lack of reconciliation between patron's edge and raiser's edge. And despite the fact that the government and Mr. Humme explained on multiple occasions that any lack of reconciliation between those two systems would have actually been to the benefit of the defendant, the defendant persisted in raising this objection. The fact that the defendant went out and obtained an expert to look into that, doesn't that take away a little bit from the frivolous nature of any arguments? I think that the fact that the defendant went and got an expert but persisted in making arguments that were clearly frivolous at a certain point is what makes, at least that particular attack, makes it frivolous. So I can imagine a situation in which an expert like Mr. Logaitis, who isn't steeped in the ins and outs of the museum and the museum systems, might think that that is a valid criticism, a valid challenge to make. And yet when the response comes back, both from the government and from the government's expert as to why, logically, that actually works to her benefit, and yet the challenge persists, I think at that point the line has been fully crossed. I think also we have a situation here, distinguishable from some of the cases the defendant cites, in which the defendant did not express remorse during the sentencing hearing, and I think that's something that the district court also fairly considered in making its determination that the defendant did not deserve acceptance of responsibility. I see that my time is almost up, but on that last point, I do also want to emphasize that the district court did note that its determination on acceptance of responsibility was one that it deemed, at the end of the day, harmless with respect to its overall sentencing decision. It was a determination that the district court made, and yet also clearly found that this would not have affected the ultimate sentence given to the defendant, because in his words it would have only been a, quote, technical acceptance of responsibility. And unless there are any further questions from the court, I would ask that the court affirm the district court's judgment. I see none, so thank you very much. I think you ran out, Mr. Sasson, but I'll give you a minute. I'm just going to address some of these very quickly. The further checking and the loose ends that were referred to in the first half, again, accounts to 68% of the loss calculated, and if you would compare Mr. Lougais' calculations with Mr. Homme's, there's only a 21% correlation. So there's a lot of loose ends there. Mr. Homme testified he didn't ask for the FBI information that they were able to obtain, didn't consider Clayton's information regarding other employees stealing that she was aware of in his factors, and assumed 100% input accuracy despite the fact that Ms. Clayton and Ms. Borrello indicated that there were reconciliation issues going until 2014. Finally, in terms of the differences in evidence, Mr. Lougais provided evidence in terms of a different calculation for 2008 through 2011, and in terms of acceptance, we did rely our entire approach to the challenging of the amount was based on the appointed forensic accountant's opinions. To the extent that Judge Lee indicated that there was a frivolous issue about the lack of reconciliation, I would say it was an example of how the method used was inaccurate as opposed to the thing, the main point in terms of the amount. All right. You need to wrap up now. And finally, in terms of the prejudice, I summarized in the brief the differences in the ranges. Even though this was within the range that Judge Lee found, it was above and on the high end of the other one, and it did drive the sentence. Thank you, Judge. All right. And Mr. Sassen, you accepted this case by appointment, I believe. I did. We thank you very much for your service to the client and to the court. Thank you. And thanks as well to the government. We'll take the case under advisement.